Opinion

per curiam:

This case involves claims for shortages in a War Assets Administration sale of surplus property in 1949. The plaintiff claims the defendant breached the contract in not delivering to plaintiff certain items involved in the contract. The Government counterclaims for the unpaid balance of the purchase price, plus interest from the date of default.
The commissioner was directed to make findings of fact and to recommend legal conclusions in the light of the findings of fact under Rule 45 (a) of the Rules of this court.
Pursuant to such reference, the commissioner has submitted his findings of fact and conclusions of law.
*486 The court, after having considered the evidence, the briefs and argument of counsel, agrees with the result arrived at by the commissioner and adopts the findings and opinion of Commissioner W. Ney Evans, as hereinafter set forth, except for the tube claim based on the item listed as “Cracking Case” in the brochure. As to the tube claim, we agree with the result arrived at by the commissioner but for this additional reason: The contract contained special conditions of sale which incorporated an agreed formula under which the Government would be paid for overages and plaintiff would be credited for shortages. The formula contained a provision that “The acquisition costs listed in the sales brochure shall be controlling.” The sales brochure listed:
CEACKING-CASE: Type C-23 Houdry, Spec. #SP-2434T2-1, Badger & Sons Co., Drawing #HC-46,11'5" I. D. 1 Ys" thick shell, Material Silicon Firebox steel, w/tube elements, baffles, plates, flanges, etc. for vert, mounting.
Propr loc: #1 Acq. $1,017,000.00
The evidence shows that the cracking case alone had an acquisition cost to the Government in excess of $1,017,000. Therefore, plaintiff as a result of the transaction received an article which had cost the Government at least as much as set forth in the brochure. This was all plaintiff could expect- — it got all the Government contracted to sell and all it contracted to buy.
In all other respects we agree with the Commissioner and adopt the findings and opinion as printed below.
Plaintiff is therefore entitled to recover $15,730.08 on its petition, and defendant is entitled to recover $179,690.25 on its counterclaim. Defendant’s recovery is offset by the amount of plaintiff’s judgment on the petition leaving a net recovery by the Government on its counterclaim in the amount of $163,960.17, with interest at four percent from June 13,1949.
It is so ordered.
*487 OPINION OP COMMISSIONER
Tbe contract in suit was founded upon the acceptance by War Assets Administration[1] of plaintiff’s bid for surplus property consisting of equipment and accessories for refining gasoline. The offering by WAA and the bid submitted by plaintiff were subject to certain standardized conditions (selected by WAA), which were restated in the formal contract and in the sales documents.[2] In formalizing the contract, however (after conditional acceptance of the bid but before delivery of the sales documents), the parties wrote into the contract certain other provisions initiated by WAA and not theretofore used by it. These provisions called for a joint inventory of the property at the time of its delivery and for the application of an adjustment formula whereby plaintiff would be given credit for shortages disclosed by the inventory or pay extra for overages.
The inventory disclosed shortages but no overages. Plaintiff thereupon demanded adjustments according to its interpretation of the contract, the bulk of which (in dollar volume) defendant refused to make. Plaintiff thereupon ceased making scheduled payments on the contract price, contending that credits rightfully due would, if allowed, exceed the unpaid balance. Defendant duly demanded first a resumption of scheduled payments and then payment of the whole balance. In time, the General Accounting Office issued to plaintiff a Certificate of Indebtedness demanding payment, with interest, of the unpaid balance adjusted by minor credits. Plaintiff then filed this suit. Answering the petition, defendant asserted a counterclaim in conformity with GAO’s Certificate of Indebtedness.
The purchase price was $852,775. The amount paid thereon by plaintiff was $173,084.75, leaving an unpaid balance of $179,690.25.
By this suit plaintiff demands allowances under the contract, pursuant to the adjustment formula, for five alleged shortages, totaling $223,172.41, as follows: (1) tube elements *488 alleged to have been, missing from cracking cases, $212,-386.83; (2) 19 valves, $6,650.80; (3) spare parts, $2,850.23; (4) eight pumps, $1,110.24; (5) structural steel, $174.81. In addition, plaintiff claims the market value ($4,944) of two hoists and a depropanizer tank, in lieu of allowances under the adjustment formula, because defendant disposed of these items after the sale to plaintiff had become final. The total of plaintiff’s demands is $228,116.41. Conceding defendant’s right to recover on its counterclaim the unpaid balance of the purchase price ($179,690.25), plaintiff demands judgment for the difference, $48,426.16.
Defendant counterclaims for (1) the principal sum of $171,517.09 (representing the initial unpaid balance of the purchase price adjusted by four credits totaling $8,173.16), plus (2) interest on the principal sum at the rate of 4 percent per annum from June 13, 1949, until paid.
The four credits allowed by defendant (totaling $8,173.16) were computed by the adjustment formula as for shortages, as follows: (1) 19 valves; credit, $6,650.80; (2) 8 pumps; credit, $1,110.24; (3) structural steel; credit, $174.81; and (4) the two hoists and depropanizer tank; credit, $237.31.
The foregoing allowances eliminated from controversy the adjustments for shortages of valves, pumps, and structural steel. Defendant concedes and plaintiff accepts credit on account of them in the amount of $7,935.85.
The controversy relates to defendant’s refusal to recognize the absence of the tube elements and the spare parts as shortages compensable under the adjustment formula and to plaintiff’s refusal similarly to recognize the absence of the tank and hoists as shortages so compensable.
Inasmuch as defendant disposed of the tank and two hoists after the sale to plaintiff had become final, plaintiff contends that the adjustment formula provisions (whereby it would be entitled to the $237.31 credit tendered by defendant) do not apply; but that the failure to deliver the items amounted, under the circumstances, to a breach of contract, for which plaintiff is entitled to recover the market price of the equipment ($4,944).
*489 Defendant contends (1) that the inventory and adjustment provisions were intended by the parties to apply to all shortages of any items in the list; and (2) that, in any event, the disposition of the items after the sale to plaintiff would amount to a conversion, comprising a tort, over which this court has no jurisdiction.
The evidence sustains plaintiff’s contention on the factual issue, i. e., the intention of the parties. The representative of WAA who negotiated the adjustment formula provisions with plaintiff’s agent did, no doubt, intend for the adjustment formula to cover all shortages.[3] The evidence fails to show, however, that he communicated this intention to plaintiff’s agent. The course of conduct between the parties, and the background of general information against which the negotiations were conducted, were such that plaintiff could not reasonably have been expected to infer such an intention on the part of WAA, or,- if inferred, to have acquiesced in it without at least a clear expression of purpose by WAA.
The fact that the sale and transfer were made after the sale was consummated takes this case out of the category of Condenser Service and Engineering Company, Incorporated v. United States, 126 C. Cls. 186 (1953), where the sale to a third party was made before the sale to Condenser became final, and puts it in the category of Hummel v. United States, 58 C. Cls. 489 (1923), and Miller v. United States, 135 C. Cls 1 (1956), where defendant’s action depriving the buyer of the property occurred after the sale had been made. There was no escape clause in the instant contract, as in Silverton v. United States, 118 C. Cls. 232 (1951), Schneiderman v. United States, 117 C. Cls. 715 (1950), or North and Judd Manufacturing Company v. United States, 114 C. Cls. 355 (1949).
The recoveries allowed in Miller, supra, and in Turney v. United States, 126 C. Cls. 202 (1953) indicate that plaintiff in this case may recover, as for breach of contract, if not for a taking.[4] On this claim plaintiff is entitled to recover *490 $4,944, the fair and reasonable market value of the equipment at the time defendant disposed of it.
The facts also sustain plaintiff’s claim for the shortage of spare parts.
Negotiation of the adjustment formula was initiated by WAA as a safeguard (additional to the selected, standardized conditions, general and special) against claims by the purchaser of the property for any shortages of items that might be revealed upon delivery. The WAA representative (a lawyer in the General Counsel’s office) who undertook the assignment went to some pains to devise a formula satisfactory to WAA and acceptable to plaintiff, which would result in crediting the purchase price (as nearly as could be achieved by formula) for any item listed in the sales offering which might prove to be missing. The objective, which plaintiff’s agent fully understood and in which he and plaintiff eventually acquiesced, was to provide credits for shortages at or near plaintiff’s purchase price, no more and no less.
In devising the formula the negotiators adopted two features of the sales brochure as stakes to tie to. One was the listings, in the brochure, of ITEM(s), in capital letters. The other was the acquisition costs of the ITEM (s) shown in the brochure. According to the formula as agreed upon, if any ITEM listed as TUBES, PIPE, PUMPS, or VALVES should be missing, the credit to be allowed should be 18 percent of the acquisition cost of the ITEM as shown in the brochure. The credit for any other missing ITEM was to be 4.8 percent of the acquisition cost shown in the brochure. These agreements were duly recorded in the exchange of letters (on December 30, 1948) by which the contract was formalized.
If the WAA representative was as thorough in projecting the details of the inventory as he was in establishing the adjustment formula, the results were lost in reducing the contract to writing.[5] The written contract provided only that a joint inventory of the property should be made at the time of its delivery to plaintiff. All that can be made *491 of the evidence of record is that the negotiators for the parties recognized the necessity of an inventory as inherent in the application of the adjustment formula; and that provision for the inventory was inserted in the written contract as above stated.
When it came time to make the inventory, however, plaintiff’s vice president obtained from WAA officials copies of the warehouse cards.from which the sales offering had been compiled. These cards listed some information more than was contained in the sales offering. Plaintiff’s vice president supplied these cards to the representatives who were to conduct the inventory for plaintiff. Similar cards were held by the men assigned by WAA to represent it in the inventory. The respective representatives so assigned by the parties proceeded to make an inventory, not only of ITEM(s) in the sales brochure, but of all units in each ITEM. Plaintiff’s claim for “spare parts” reflects the confusion and misunderstanding resulting from disclosure by the inventory that, while the ITEM was identifiable, most of its units were missing.
The ITEM was listed in the sales brochure as “COMPRESSORS & Motors, Spare parts for, as follows * * The quantity was given as “1 JL” (one Job Lot). The description listed three sets, with three separate acquisition costs, a total acquisition cost of $59,985.60, and total gross weight of 493,591 pounds.
The inventory disclosed only 4,979 pounds of spare parts, which plaintiff received. Plaintiff now claims credit, by application of the adjustment formula (4.8 percent of the acquisition cost) to 98.99 percent of the total acquisition cost, because it received only 1.01 percent of the gross weight.
WAA refused the credit on the ground that the error was so patent (in terms of pounds listed and acquisition cost given, indicating the purchase of nearly half a million pounds at a cost of 12 cents per pound) as to put plaintiff on notice.
On the basis of the terms stated in the offering and the conditions subsequently accepted by plaintiff in submitting *492 its bid, the reasoning behind WAA’s rejection of the claimed credit had strong if not ample support to sustain it.
The insertion in the contract of the inventory and adjustment formula provisions, however, injected elements for consideration other than the absence of warranty of description in the sales offering.[6] The contract provisions for the adjustment of shortages would be almost devoid of meaning if they were not intended to cover the shortage of the whole of any ITEM in the brochure. So considered, and on balance against the possibility of notice on which WAA relied in rejecting the credit, the provisions are deemed applicable to this claim.
The listing of the ITEM in this instance confined the capital letters to the word “COMPRESSORS”. The content of the ITEM, however, as distinguished from the description (relating to the nature of the equipment), was “spare parts for COMPRESSORS” and motors. No other reading of the ITEM makes sense.
The ITEM in question was identifiable, it is true, but only by the presence of 1.01 percent of the property listed. As a practical matter, therefore, the ITEM was missing.
Plaintiff is entitled to recover the claimed credit of $2,850.23 for the missing spare parts.
The facts do not sustain plaintiff’s claim for the “missing” tube elements.
The ITEM in this claim was CRACKING-CASE. The quantity was listed as 18, meaning that there were 18 of the cases. Among other things in the description of the ITEM were the letter, symbol, and words “w/tube elements * * *,” which meant “with” tube elements, et cetera.
The description was in error. There were no tube elements in the cracking cases; and there were none with the cracking cases in the sense of being adjacent, unlisted units of the cracking case ITEM. The brochure listed many TUBES as separate ITEM(s), but all of the tubes so listed *493 would not have made up the quota of tube elements for 18 cracking cases.
Plaintiff’s contention is that, because there were no tube elements in the cracking cases, or with them as described in the preceding paragraph, there was a shortage of tube elements; that the extent of the shortage was the amount of tube elements required to equip 18 cracking cases; that the adjustment formula should be applied and credit allowed accordingly; and that application of the adjustment formula would call for 18 percent of the acquisition cost of the missing tube elements.
Plaintiff prepared and presented its claim accordingly. It obtained the drawings from which the cracking cases and tube elements were manufactured and ascertained from them the identity and quantity of tube elements designed for the cases. The TUBE listings in the brochure were then examined to ascertain the acquisition costs.[7]
In view of the nature of the considerations deemed dis-positive of this claim, it is unnecessary to review in detail the legal contentions of the parties relating to it. Suffice it to note that plaintiff relies on the contract, invoking the inventory and adjustment provisions, without reference to other conditions of the offer and sale or to the presence or absence of warranties; while defendant does invoke the terms and conditions of the offer and sale, with particular reference to WAA’s negation of any warranty of description.[8]
As heretofore indicated, the dispositive weakness of the tube claim is factual. Plaintiff has failed to prove reasonable reliance upon the “tube elements” entry in the brochure in the preparation and submission of its bid,[9] and has further failed to prove reasonable reliance upon the in- *494 elusion, of tbe tube elements in the sale at the time the contract of sale was formalized.
Plaintiff did not know, when it prepared and submitted its bid, that the tube elements were missing. However, the factual details relating to the preparation of the bid are such that plaintiff reasonably should have questioned the inclusion of the tube elements in the listing, and should at least have sought further information before bidding in reliance on the entry.
Ten weeks elapsed between the submission of the bid and the exchange of letters formalizing the contract. During this interim the man who should have questioned the tube element entry in the first place sought and obtained information which should have underscored the need for further inquiry before formalizing the contract, if plaintiff seriously expected to receive the tube elements with the cracking cases.
The evidence is none too clear as to just what did happen. It falls short of warranting the finding requested by defendant, that plaintiff had actual knowledge of the absence of the tube elements before the formal contract was signed. By the same token it falls short of warranting a finding that, at the time of the formal contract (and, for purposes of this analysis, disregarding the absence of reasonable reliance at the time of submitting the bid), plaintiff reasonably believed the tube elements were included in the sale.
On the facts, therefore, support for plaintiff’s claim fails unless the insertion in the contract of the inventory and adjustment provisions so modified the contract as a whole as to assure plaintiff of an adjustment for any and all units missing from any item, regardless of all other facets of the transaction. The insertion of the inventory and adjustment provisions in the contract was not so intended by either of the parties. Plaintiff is therefore not entitled to adjustments for missing units or items which it reasonably should have known, in spite of their listing, were not included in the sale.
The facts supporting the foregoing conclusions as to the absence of reasonable reliance by plaintiff are fully developed in the findings, and need be only summarized here.
*495 Plaintiff’s bid was prepared and the submission of it was authorized by the president of the corporation. At that time he had been in the business of salvage liquidation for approximately 40 years, and his experience had included many large operations.
When the bid in the instant case was prepared, plaintiff’s president had recently returned to Seattle from the Orient. A business associate in Los Angeles brought to his attention the offering by WAA, and plaintiff’s president accepted and acted on his report of the offering in the preparation and submission of the bid. Plaintiff’s president never saw the sales brochure before the bid was submitted.[10]
At the time of the report by the volunteer agent to plaintiff’s president the two men were associated in a Los An-geles venture involving the dismantling of an oil refinery. Knowing of the preference of plaintiff’s president for basing bids on weights, the volunteer agent translated the brochure items into weights which he reported to plaintiff’s president, and which the latter used (subject only to check by himself and members of plaintiff’s office staff) to prepare the bid. As part of the report, the agent, talking with plaintiff’s president by phone from Los Angeles to Seattle, said that the cracking cases “are full of tubes,” and gave his figure representing the weight of the 18 cracking cases with all tubes installed.
The notion that the tube elements were in the cracking cases was the agent’s own idea. The sales brochure said “with”. The agent knew that the friend who gave him the sales brochure (a Special Eepresentative of the Standard Oil Company of California, who likewise had had recent experience with the mechanics and components of an oil refinery) did not believe the tube elements were in the cracking cases.
The weight of the cracking cases with tube elements installed, as reported to plaintiff’s president, was also the agent’s product. No weights were given in the brochure’s ITEM of CEACKING CASE.
*496 Considering tbe contents of the sales brochure, unhurried reflection by one with knowledge of refining machinery should have indicated the need for further information before acting on the assumption that the tube elements had been installed in the cracking cases. Once that assumption was questioned, the evidence indicating the need for inquiry became cumulative.
The brochure stated that the property for sale had been crated and boxed for shipment. Each cracking case was a large cylindrical tank, approximately 12 feet in diameter and 30 feet in length, made of metal 1 inch thick. It was so described in the brochure. Obviously, the weight of the case alone was considerable. Because of its weight and bulk, skidding appeared to be the only feasible method of moving it. The weight of the tank would have been more than doubled if the tube elements had been installed in it. Weights, therefore, should have flagged consideration of shipping problems, such as the capacity of railroad flatcars and steamship cranes.
The sales brochure contained two other obvious invitations for reflection by a man with knowledge of refining machinery. One was the acquisition costs of the various items listed. The other was the extent of the listings, as ITEM(s) separate from the cracking cases, of tubes and tube elements.
If experience with refining machinery had produced even rudimentary knowledge of manufacturing costs, such knowledge would have included (1) some acquaintance with the cost per cracking case, empty (which was apparent from the brochure listing) and (2) the fact that the tube elements to be installed in a cracking case cost more than the case. A few minutes’ application of a pencil to the back of an envelope, using only the information in the brochure, should have raised more questions in the mind of a man of experience than he could answer without further information.
The heading of the brochure contained the words “two incomplete units.” One with experience with refining machinery might well have known that a complete refining plant may include several cracking cases, and thereby have deduced that the “two * * * units” had reference to two *497 plants. In any event, the word “incomplete” should have raised a question in the mind of a man capable of recognizing enough tube elements, independently listed in the brochure, to fill almost 70 percent of the quota of 18 cracking cases (after allowing for two complete sets of spares), if he was also committed to the idea that each of the 18 cracking cases also had its complete quota of tube elements (either in or with).
Defendant’s sales brochure was published and distributed for the purpose of informing prospective bidders. It contained several warnings in the nature of caveat emptor. If plaintiff’s volunteer agent had examined it as critically as its reason for being warranted and as he was capable of doing, he would have found reason to seek further information concerning the listing of cracking cases “w/tube elements.” He did not make such a critical examination of the brochure.
Plaintiff accepted the report of this volunteer agent and made no examination of the brochure on its own. The principal thereby adopted as its own the act of its agent. Since the agent’s reliance on the description and representation of the brochure was not, in this particular, a reasonable reliance, it follows that plaintiff’s reliance was not reasonably based.
In December 1948, before the exchange of letters between WAA and plaintiff formalizing the contract, plaintiff’s volunteer agent inquired of WAA as to the weight of a cracking case and was informed of its approximate weight. The figure so given reflected less than 40 percent of the weight the agent had ascribed to a cracking case with the tubes installed.
While the evidence is not clear as to what use, if any, was made of this information by either the plaintiff or its volunteer agent, the fact that both had the information, together with other evidence relating to their interim activities in relation to the sale, warrants the inference that plaintiff was reasonably put on notice to seek further information concerning the tube elements before entering into a contract in reliance upon their presence in the sale.
*498 Plaintiff is entitled to recover, on five claims, the total of $15,730.08,[11] to be set off against the recovery by defendant on its counterclaim.
Defendant is entitled to recover, on its counterclaim, the principal sum of $163,960.17, representing the unpaid balance of the purchase price ($179,690.25) offset by plaintiff’s recovery (of $15,730.08) as defined in the preceding paragraph.
Defendant claims interest on the principal sum from June 13, 1949. The claim is predicated on the provisions of the contract whereby WAA agreed to accept payment of the purchase price in stated sums at stated times, with interest at 4 percent per annum on any sum not paid in accordance with the schedule.
Plaintiff disputes the claim for interest, contending that the balance (if any) due to defendant after the expiration of the agreed 180 days could not be determined until the differences between the parties on the claims here in suit were either settled or adjudicated; and that the recovery of interest in this suit would in effect penalize plaintiff for delay in the adjudication of the claims, for which delay plaintiff is not responsible[12] and therefore should not be accountable.
The contract provisions relating to the payment of interest are set forth in findings 20 and 24. Those provisions were agreed upon after the insertion of the inventory and adjustment provisions in the contract, and contain no reference to them. Plaintiff’s request for postponement of payments pending adjustment was rejected by WAA. (Finding 28.)
In the absence of specific reference by the parties to the possibility of delay in payment resulting from the inventoiy and adjustment provisions, their contract for interest on delayed payments must control as written.
*499 Defendant is entitled to recover interest on the principal sum of $163,960.17 at the rate of 4 percent per annum from June 13, 1949, to the date of judgment.
FINDINGS 0E FACT
1. The instant case is concerned with the sale, as war surplus property, of equipment and accessories for cracking, treating, and refining gasoline. Defendant had ordered the material in 1944 for shipment to Eussia under lend-lease.[1] Sometime in 1945 the shipment was canceled. In 1947 the material was declared surplus, and in 1948 it was offered for sale.
2. This lot of refining machinery was part of the enormous surplus for sale after the war. The procurement program of World War II, begun in 1940 as part of the national defense effort, was the largest in the nation’s history. The huge surplus was accumulated with the ebb and flow of the fortunes of war, and was climaxed by the termination of war contracts after the cessation of hostilities in August *500 1945.[2] The disposal of the bulk of the war surplus was handled by the War Assets Administration (hereinafter referred to as WAA) [3] during the years 1946-1949.
3. Soon after the cessation of hostilities, dismantling operations were begun by the defense agencies, where much of the wartime surplus had accumulated. In many instances rapid reductions of manpower occurred, as a consequence of which neither the labor nor the continuity of direction was available for assembling or maintaining accurate records of surplus property. The agencies responsible for surplus disposal therefore frequently received incomplete, inaccurate inventories. These deficiencies were reflected in their listings of sales offerings. Buyers’ claims for shortages and misrepresentation followed, resulting in litigation. Within a short time after WAA began operations, in March 1946, experience made the agency acutely aware of many pitfalls inherent in its undertakings. [4]
*501 4. (a) As experience accumulated WAA developed variations in sales techniques in terms of (1) types of sales and (2) stated conditions for insertion in offerings for and contracts of sale.
(b) With respect to property so located and stored as to be available for full inspection by potential bidders, the usual processes of invitation (by advertisement) and response which normally characterize competitive bidding were used, with sale to the highest bidder.
Materials gauged by the trade according to weight (such as metal and metal products) were sometimes offered by weight, in that bids were invited at prices per pound or per ton.
Odd lots of property inaccessible for full inspection prior to sale because of storage in scattered locations or because of having been crated for shipment were usually offered “as is, where is,” without warranty of description or quantity.
The “negotiated sale” (used in the instant case) combined competitive bidding with features of an auction. An offering (listing the property in a printed brochure) was distributed, inviting bidders to attend at a designated time and place. There, each bidder gave to a WAA representative a card or slip of paper showing his bid. The WAA representative reviewed the bids on the spot, checked them against WAA’s anticipated ratio of return, and against his own judgment of the possibility of getting a higher bid from someone then present or in a reoffering, and either accepted the high bid, asked for further bids by those present, or announced no sale.
If and when the high bid forthcoming from this process met the standards of WAA or satisfied the judgment of its representative, he would announce the acceptance of it. His acceptance, however, was preliminary and conditional. The hid and his action had to be reported and passed through channels for review and confirmation before a binding contract with WAA could come into being.
(c) WAA developed a series of stated conditions, phrased in standard form, for selective insertion in sales offerings and contracts, according to the agency’s analysis of the circumstances surrounding any specific property to be offered *502 and sold. The selections of standard and special conditions for insertion in sales offerings and contracts were made with the intention of warning bidders of varying degrees of cmeat emptor and of protecting the agency against claims, with particular attention by WAA to the difficulties it had encountered as a result of faulty inventories received from declaring (defense) agencies and the consequent deficiencies in its own listings.
(d) At the time of the offering involved in this case, the types of sales, the standardized stated conditions, and the reasons generally for their selection and use in specific instances, as described in the preceding paragraphs of this finding, were known to all potential bidders engaged in the business of buying Government surplus for salvage or for scrap.
5. (a) In August 1948, WAA published and distributed (by mail) 1,100 copies of a 48-page brochure entitled “New York Negotiated Sale, Equipment and Accessories for Hou-dry Gasoline Cracking and Treating Refinery (Two Incomplete Units), Special Listing NYL-61-OL-7653.” [5]
(b) The cover page of the brochure disclosed that the contents related to “Government Surplus” held by WAA, and noted the following: (1) “Sale Dates: Opens August 16, 1948 and no offers will be considered after 2:00 P. M. (E. D. S. T.), September 15,1948”; and (2) “To make offer contact War Assets Administration, Negotiated Sales Unit, 40 Wall Street, * * * New York 5, N. Y. * * *”
(c) The back cover of the brochure contained “Standard Sales Conditions — Effective as of August 15, 1947.” At the bottom of the page was the following note:
Special Condition of Sale — Notwithstanding and in addition to any of the provisions hereinabove stated, this sale is made subject to all special conditions indicated in the sales offering.
The Special Conditions of Sale were set forth in the opening pages (A and B) of the brochure.
*503 (d) Page A (inside front cover page) of the brochure set forth “General Information Regarding [the] Special Listing * * *,” pertinent parts of which follow:
WHAT IS FOR SALE?
Equipment & accessories for Houdry Gasoline Cracking and Treating Refinery (Two Incomplete Units) (Unused).
DATE OF SALE:
Sale opens August 16 and no offers will be considered after 2:00 P. M. (E. D. S. T.), September 15, 1948.
WHO MAY BUY?
The priorities and preferences established by the Surplus Property Act of 1944 are no longer in effect and all buyers participate on an equal basis. (All the equipment in this listing requiring screening by JANMAT has been so screened.)
WHAT QUANTITIES MAY BE PURCHASED?
Lot will not be broken.
HOW WILL PROPERTY BE SOLD?
Negotiated Sale, property at locations 3, 4 and 6 being offered on an “As Is” F. O. B. location basis (purchaser pays for all transportation charges from point of location), property at locations 2, 5 and 7 on an “As Is, Warehouse Platform” basis (purchaser is responsible for any necessary packing, crating, skidding, loading and shipping), property at location 1 on an “As Is, Where Is” basis (purchaser is responsible for any necessary dismantling, removal, packing, crating, skidding, loading and shipping) .[6]
WHERE IS PROPERTY LOCATED?
1. Sun Ship & Dry Dock Co., Chester, Pa.
2. Yonkers Whse. Co., 517 Odell Ave., Yonkers, N. Y.
*504 3. Marietta T. C. Depot, Marietta, Pa.
4. Belle Mead General Depot, Belle Mead, N. J.
5 & 7. General Builders Supply Co., 138 Street & Harlem River, Bronx, N. Y.
6. WAA Facility #124, Elmira Q. M. Depot, Horseheads, N. Y.
MAY PROPERTY BE INSPECTED?
Packed for export; boxes will not be opened for inspection.
HOW TO MAKE OFFER?
Contact WAA Negotiated Sales Unit, 40 Wall Street, 8th floor, New York, N. Y. (Whitehall 3-3640, Ext. 57 or 327).
WITHDRAWADS:
Property in this sale may be withdrawn up to the time of a sales contract with the buyer, for considerations of National Defense, disaster relief and other special programs established by legislation. Prospective buyers interested in specific items should verify their availability by phone the day before the sale.
*****
EXPORTERS:
It is incumbent on the purchaser of surplus property for export to determine if an export license is required and can be obtained.
(e) Between cover pages the sales offering set forth 44 pages of items under the heading “Lot 1 (Unused) Equipment & Accessories for Houdry Cracking & Treating Units, (Incomplete) ”. Each page contained two columns and each column contained three subheadings: “Item”, “Description”, and “Qty” (for Quantity).
Under “Item” in each column there were listed various things, such as “TUBES”, “PARTS”, “TANK”, “MOTOR” (to illustrate by selections taken at random). The name of each “Item” was set forth in capital letters.
Under “Description” in each column there were listed, after the name of the “Item”, and in lower case type (except for occasional initial capitals): (1) Various identifying data, including some dimensions, and, occasionally, weights; (2) the number of the property location (keyed to the listing of *505 locations in the General Information (paragraph (d), above) ; and (8) the acquisition cost of the item.[7]
Under “Qty” (Quantity) in each column there were listed, usually, a number ranging from “1”, “5”, “18”, “23”, to “2190”, with the number followed by “Ea.”, signifying “Each”. Occasionally, “Ea.” was replaced by “Lot”, or “Sets”, or “pc.”; and in a few instances the quantity was given in pounds.
(f) The 88 columns of the 44 pages contained 1,073 listings under “Item” and accounted for acquisition costs totaling $3,026,676.21.
6. (a) The main controversy in this case centers around the opening item listed in the sales offering, the text of which follows:
CEACKING CASE: Type C-23 Houdry Spec. 18 #SP-2434T2-1, Badger & Sons Co, Drawing Ea. #HC-46, 11'5" I. D. 1 %" thick shell, Material Silicon Firebox steel, w/tube elements, baffles, plates, flanges, etc. For vert mounting. Propr loc: #1 Acq. $1,017,000.00 (Eef: WAA 3295063-1-1 TPLL-2200 Whse. Loc: N. A.)
(b) The symbol and words, “w/tube elements * * *”, meant with tube elements, et cetera. The abbreviation “Acq.” meant acquisition cost, and the figure following it meant that the acquisition cost of the 18 cracking cases listed in the item was $1,017,000.[8] The abbreviations and numeral, “Propr loc: #1”, meant that the cracking cases were located at “Sun Ship & Dry Dock Co.”, Chester, Pennsylvania.[9]
7. (a) The tube elements were not m the cracking cases, as plaintiff had assumed, and one of plaintiff’s claims in this *506 action is for alleged shortage of tubes. This claim is more fully described in finding 25.
(b) Fifteen other listings in the brochure represent the bases of six additional claims for shortages by plaintiff. These claims are described in findings 26 and 27. An eighth claim, as to which plaintiff acquiesced in defendant’s acceptance of an accord and satisfaction, is described in finding 29 (c) and (d).
(c) The disposition made of plaintiff’s claims by WAA is summarized in finding 29.
(d) The claims and counterclaim pressed in this suit are summarized in finding 30.
8. (a) The initial offering of the special listing (closed, September 15, 1948) failed to produce a bid acceptable to WAA. A reoffering was ordered for October 14, 1948. Three bids were received at that time, the highest being in the amount of $301,555.5'5. While these bids were under consideration, plaintiff submitted its first bid, in the amount of $337,750.00. WAA thereupon rejected all bids, and ordered a renegotiation on October 22, 1948. Plaintiff then submitted the bid upon which the special listing was conditionally awarded to it. This bid was in the amount of $352,-775.00.
(b) Plaintiff’s successful bid was submitted on a printed WAA form[10] as an “Offer to Purchase” by a “Distributor”[11] who wanted to purchase for “Resale”. The offer listed “1 Lot” as the item number and as the quantity, and described the property as “Equipment and accessories for Houdry Gasoline Cracking and Treating Refinery (Two Incomplete Units), Condition: Unused.”
(c) On the face of the Offer to Purchase there appeared the f ollowing:
It is expressly agreed by the parties hereto that the property covered by the agreement is sold “As Is” or “As Is, Where Is” whichever is applicable to the particular sale, and that seller makes no warranty or representation, express or implied, except that seller has the right to transfer title to such property. It is further agreed that any statements or other language contained *507 in the sales brochure, advertising, or other literature, or in the sales agreement relating to the property, whether regarding its condition, description, or otherwise, are merely for general information purposes and to assist in identification of the property, and shall in no event constitute a warranty or representation concerning such property, regardless of any opportunity for inspection, offered or exercised, or serve as the basis for any claim by the purchaser, whether for adjustment of the purchase price or otherwise.
Please deliver the items stipulated above in accordance with the Standard Sales Conditions of War Assets Administration, dated August 15, 1947, as amended by other stated terms specified in sales offering. * * * See reverse side for WAA terms and conditions applicable to this sale.
(d) On the reverse side of the Offer to Purchase there were set forth, under the heading “Standard Sales Conditions,” three segments relating to (1) Fixed Price Terms, (2) Conditions of Sale, and (3) Special Conditions of Sale.
The following note appeared at the end of the segment on Fixed Price Terms:
Prospective purchasers are urged to inspect the property offered for sale. Arrangements for inspection may be made at the nearest Office of War Assets Administration.
The Conditions of Sale were identical with the “Standard Sales Conditions” set forth on the back cover page of the sales offering.
The segment under Special Conditions of Sale was as follows:
Notwithstanding and in addition to any of the provisions hereinabove stated, this sale is made subject to all special conditions indicated in the sales offering. * * *
(e) The Offer to Purchase was dated October 22, 1948, and was signed in plaintiff’s name by “Irwin Geiger, Attorney and Agent.”[12] At that time Mr. Geiger had served plaintiff in the capacity of agent as well as attorney for a period of ten years.
9. (a) Two other bids were submitted to WAA at the renegotiation of October 22, 1948, one in the amount of *508 $261,150.95, and one in the amount of $307,551.50. Both bidders were located east of the Mississippi River, and each made some investigation of the property at the storage sites before preparing its bid.
(b) The low bidder sent a representative to Chester, Pennsylvania, to view the cracking cases at the Sun Shipbuilding plant. Among the notes made by the representative, from words and figures stenciled on the cracking cases, were the following:
Dimensions 13' O. D. 37'5" overall length.
Gross weight 156820. Net weight 153940.
(c) The intermediate bidder’s representative also visited the Sun Shipbuilding plant, obtained the weight data listed in the preceding paragraph, and learned, upon specific inquiry, that the tube elements were not in the cracking cases. He then made further inquiry at the offices of Badger & Sons Company, buying agent for the Procurement Division of the Treasury Department. These investigations and inquiries were made: (1) because of the representative’s knowledge of previous inaccuracies in WAA listings (which, he testified, when coupled with the specified terms and conditions of the sale, indicated to him the advisability of seeking such additional information as might be available); and (2) because of the representative’s uncertainty as to whether the description in the brochure, “w/tube elements” et cetera, meant that the tube elements were in the cracking cases; or merely with, i. e., outside.
10. Plaintiff’s bid was prepared by the president of the corporation.[13] At that time plaintiff’s president had been in the business of industrial salvage for upward of 40 years.[14] In the preparation of bids he preferred to base his computation on weight. The bid in the instant case was so prepared (as hereinafter more fully described), and, up to the time of the submission of the bid, plaintiff’s president had never seen defendant’s sales offering.
11. (a) One of the men who attended the bidding of the initial offering in September 1948 was a Special Representative of the Standard Oil Company of California, who *509 served the company as a buyer of war surplus material. He had reviewed the sales offering prior to the bidding, but did not submit a bid. He had previously done some wort in connection with one of his company’s refineries where cracking cases similar to those in controversy had been installed. One or more of his associates in that work reviewed the sales brochure with him, and they discussed together its meaning. The Special Eepresentative was of the opinion that the tube elements were not installed in the cracking cases.
(b) When information reached this Special Representative that the initial offering had not resulted in a sale,[15] and that the material would be reoffered, he spoke of the re-offering to a Los Angeles man who was engaged in brokerage sales (for commissions) of salvage materials and who, at the time, was participating with the Dulien company of California in the salvage of an oil refinery. The Los An-geles man (hereinafter referred to as the commission-broker) expressed interest in the offering, and the Special Representative mailed to him a copy of the brochure. The two men conferred about the matter from time to time thereafter, and the commission-broker knew that his friend believed the tube elements to be outside of the cracking cases. The commission-broker nevertheless convinced himself that the tube elements were inside the cases, and acted accordingly.[16]
(c) Sometime in October 1948, upon the return of the plaintiff’s president to Seattle from the Orient, the commission-broker enlisted his interest in bidding on the special listing. Knowing it to be the practice of plaintiff’s president to predicate bids on weight, the commission-broker, using his knowledge of refining machinery and checking his judgment from time to time with the Special Representative of Standard Oil and other associates, computed the weights *510 of the items listed in the brochure. He computed the weights of the cracking cases on the assumption that the tube elements were installed in the cases. These computations were supplied to plaintiff’s president who had them checked by members of plaintiff’s office staff and then prepared and authorized the submission of plaintiff’s bid in reliance on them.
12. (a) Between October 22, 1948 (when plaintiff’s bid was submitted), and December 30, 1948 (when WAA and plaintiff exchanged letters formalizing the contract), various discussions occurred between WAA officials and (1) the agent of plaintiff who submitted its bid and (2) plaintiff’s vice president, who made a trip east in November to inspect the property and to arrange for a New York office to handle the resale.
(b) While the uncompleted sale was pending in the office of WAA’s General Counsel,[17] concern was expressed within WAA over the fact that, in other cases, claims had been made against the Government for the market value of shortages, exposing defendant to large liabilities. The attorney in charge for WAA was thereupon instructed to work out and negotiate with plaintiff for a settlement formula, whereby the Government’s liability, if any, would be limited to the purchase price paid by plaintiff. The attorney in charge took up the matter with plaintiff’s agent, and, after some negotiation, understanding and agreement were reached between WAA and plaintiff.
(c) WAA’s objective in this undertaking was to arrive at an adjustment formula so devised that, on the extreme assumption that all of the items sold might be missing, the plaintiff would be entitled to a refund of the purchase price and no more; and, on the more likely assumption that some of the items might be missing, settlement would be effected on a proportionate basis. This objective was explained to plaintiff’s agent by the WAA attorney.
(d) WAA’s initial proposal for an adjustment formula was payment, by WAA for shortages, and by plaintiff for *511 overages, of 11.6 percent of acquisition cost of any item missing; or over, based on the ratio of plaintiff’s bid ($352,775) to the total acquisition cost ($3,026,676.21). Plaintiff’s president, through the agent, countered with a series of percentages ranging from 11 to 25 for such varied items as cracking cases, tubing, tanks, heaters, boilers, and others. WAA found this proposal unacceptable. Further discussion disclosed that plaintiff had predicated approximately 80 percent of its bid price on items listed in the brochure as tubes, pipes, pumps, and valves. The WAA attorney thereupon obtained from the brochure the following breakdown of the total acquisition costs of those items:
TUBES (acquisition cost)_ $972,259.00
PIPE (acquisition cost)_ 133,312.00
PUMPS (acquisition cost)_ 119,555.00
VALVES (acquisition cost)_ 341,636.00
TOTAL_ 1,566,762.00
Deducting the foregoing total from the overall acquisition cost (rounded to $3,026,000) indicated $1,459,238 as the acquisition cost of all items other than tubes, pipes, pumps, and valves. Allowance of 80 percent of the purchase price for the tubes, pipes, pumps, and valves, indicated an allocation of $282,220 of plaintiff’s bid to those items, and of $70,555 to the remaining items. The amount so allocated to tubes, pipes, pumps, and valves represented 18 percent of the acquisition cost of those items, while the amount allocated to the remaining items represented 4.8 percent of the acquisition cost of such items.
The WAA attorney and plaintiff’s agent thereupon agreed to an adjustment formula, for shortages or overages, of 18 percent of the acquisition costs, as given in the brochure, of the items listed therein in capital letters as TUBES, PIPES, PUMPS, and YADYES, and of 4.8 percent of the acquisition costs of any other items. Their respective principals subsequently confirmed their action.
13. (a) As indicated by the fact that the negotiation for an adjustment formula was initiated by WAA, the probabilities were that the formula, if used at all, would be used for shortages more than for overages. One of the causes of shortages in property sold by WAA, in addition to the *512 inaccuracies of declaring agencies’ inventories (as described in finding 3) was the inability of WAA itself to maintain wholly current advices of its own transactions. Items listed in one sales offering were found, from time to time, to have been abstracted for transfer or sale in another direction before the sale noticed in the brochure took place.[18]
(b) In the negotiations between WAA and plaintiff for an adjustment formula as described in finding 12, WAA intended the adjustments to include shortages of the kind described in the preceding paragraph. Plaintiff knew of and acquiesced in this intention.
(c) Occasionally, items sold by WAA were abstracted from storage for transfer or sale in another direction, after the sale noticed in the brochure had taken place.
(d) In the negotiations between WAA and plaintiff for an adjustment formula as described in finding 12, WAA intended the adjustments to include shortages of the kind described in the preceding paragraph. It is not established by the evidence that plaintiff had knowledge of such intention on the part of WAA, or in any way acquiesced in it.
14. (a) The negotiations for an adjustment formula (described in finding 12) were predicated on the obvious necessity for an inventory (unilateral or joint) of the property sold. Agreement was later reached between plaintiff’s vice president and representatives of WAA for a joint inventory. The understanding was in essence a working arrangement, and was never spelled out in specific detail.[19]
(b) Except for the specific terms of the adjustment formula, which were included in the exchange of letters of December 30, 1948, between WAA and plaintiff, and except for the specific provision therein for a joint inventory of the property,[20] the negotiations described in finding 12 and the subsequently executed working arrangement for a joint inventory of the property were never reduced to formal, specific terms. Insofar as the contract of sale between WAA *513 and plaintiff was modified by the adjustment formula and the arrangement for joint inventory, such modifications represented exploratory procedures for WAA. As such, they were not in the category of standardized conditions as described in finding 4 (c).
15. (a) While the negotiations described in finding 12 were under way, the vice president of the plaintiff corporation, accompanied by the commission-broker who had enlisted plaintiff’s interest in the special listing, as described in finding 11, were in New York. Plaintiff’s vice president had been charged with the responsibility for the resale of the property, and the commission-broker had certain leads for the sale of part of it (to Standard Oil of California) and was in search of others.
(b) Under date of November 12, 1948, plaintiff’s vice president obtained, from the appropriate and responsible official of WAA, letters addressed to the several warehouse custodians where the property was stored, asking that he (the vice president) and the commission-broker be permitted to inspect the property stored at those locations.
(c) The evidence is inconclusive as to how many of the several locations were visited by these representatives of plaintiff at this time. It is not established by the evidence that either of them visited the Sun Shipbuilding plant at Chester, Pennsylvania, or inspected the cracking cases in storage there.
16. On December 20,1948, the commission-broker, then in Los Angeles, made phone calls to WAA in New York and to plaintiff’s president in Seattle. [21] On the same day WAA wrote two identical letters to plaintiff, marked for the attention of the commission-broker, and sent one to Seattle and one to Los Angeles. The text of the letters follows:
In response to your telephone call this afternoon, we are pleased to be able to inform you that the cracking cases in Program 7653 weigh approximately 157,000 lbs. each and measure 12 feet square by 31 feet long.
According to our documents, they were built by the Sun Shipbuilding and Drydock Co. of Chester, Pa. for the Badger Co.
*514 17. (a) On December 30, 1948, WAA wrote to plaintiff (in care of its agent in Washington) as follows:
Your offer of $352,775 for the equipment and accessories for Houdry gasoline cracking and treating refinery (two incomplete units) included in a New. York negotiated sale and described more particularly in the sales brochure designated Special Listing NYL-61OL-7653 is accepted subject to the conditions hereinafter set out.
In addition to the terms of sale specified in the general information, the special conditions of sale and the standard sales conditions set out in the sales brochure the sale shall be subject to the following conditions.
* * * * *
(4) For the purpose of determining shortages or overages an inventory shall be conducted by representatives of the War Assets Administration and the purchaser prior to or at the time of delivery. If shortages or overages are found to exist in the items of property described in the sales brochure, an adjustment shall be made in the purchase price as follows:
(a) With respect to items described as TUBES, PIPES, PUMPS and VALVES in the sales brochure adjustments shall be made on the basis of eighteen per centum of the acquisition cost thereof to the Government.
(b) With respect to all remaining items of equipment adjustments shall be made on the basis of 4.8 per centum of the acquisition cost thereof to the Government.
(c) The acquisition costs listed in the sales brochure shall be controlling.
In the event that the purchaser fails to request that such an inventory be conducted prior to or at the time of delivery of any of the property, no claims for shortages shall thereafter be entertained as to such portions of the property.
(5) That the purchaser will scrap the eighteen cracking cases Type C-23 Houdry, Spec. #SP-2434T2-1, described in the sales brochure as the first item; that the cracking cases will be scrapped to such an extent that the same can never be used for the purpose for which they were designed and manufactured, namely oil cracking and refining; that the purchaser will furnish affirmative proof of the scrapping of the cracking cases in the form of photographs and notarized documentary *515 evidence, and such other evidence as may be required.[22]
It is to be understood that this conditional acceptance of your offer and your acceptance of the conditions outlined herein will not be binding upon the parties, until advice has been received from the Department of Justice that the proposed sale will not constitute a violation of the antitrust laws. If the conditions outlined herein meet with your approval please advise promply as to your acceptance thereof, and upon receipt of antitrust clearance from the Department of Justice the New York Kegional Office will be authorized to consummate the sale.
(b) Plaintiff’s agent (signing as attorney) replied to the foregoing letter on the same day, as follows:
This acknowledges your letter dated December 30, 1948, * * * wherein you advise that War Assets Administration has accepted my clients’ offer of $352,775 for the purchase of certain equipment more particularly described in your sales brochure * * * said acceptance being subject to certain conditions set .out at length in your letter.
The conditions specified are acceptable to my clients and are accepted herewith by Dulien Steel Products, Inc. of Washington. * * *
In conformity with the requirements of your letter, request is hereby made for the inventory contemplated by paragraph 4. A representative of Dulien Steel Products, Inc. will be available for that purpose early next week. I will advise you of the exact date of his arrival so that appropriate arrangements can be made for him to meet with the representative of War Assets Administration for the purpose of the contemplated inventory. * * *
18. By letter dated January 7, 1949, the Department of Justice advised WAA that consummation of the sale would not be in violation of' the antitrust laws.
19. On January 12,1949, WAA delivered to plaintiff’s vice president six sales documents[23] being one for each of the *516 locations where the property was stored. Attached to each of the documents was a mimeographed reproduction of the contents of WAA’s letter to plaintiff of December 30, 1948, except for the omission of the first and last paragraphs thereof.
20. (a) On January 19, 1949, WAA wrote to plaintiff as follows:
It is our understanding that you offered $352,775 for property as described in Special Listing NYL-61-OL-7653 and have made a deposit thereon of $36,275; that notice of conditional acceptance was issued December 30, 1948; and that consummation of the sale is now being held up only pending the conclusion of a satisfactory long-term credit arrangement. You will recall that credit to cover the transaction has been under discussion with you off and on since October 15, 1948.
The War Assets Administration is willing to extend credit for $352,775 subject to the following terms and conditions.
1. You are to make a down payment of 15%, or $52,916.25, at the date of execution of final award.
2. The remaining balance, $299,858.75 is to be paid by you in five instalments as follows:
60 days from date of final award-$59, 971.75
90 days from date of final award_ 59, 971.75
120 days from date of final award- 59, 971. 75
150 days from date of final award- 59, 971.75
180 days from date of final award- 59, 971.75
Total_ 299, 858.75
3.Interest shall be accrued monthly on the unpaid principal amount at the rate of 4% per annum; provided, however, that the interest shall not become due and payable if full payment of the purchase price is made within 180 days from the date of final award. * * *
5. In the event of a default in carrying out any of the foregoing provisions, or any of the terms and conditions of the sale, the War Assets Administration may declare the outstanding balance immediately due and payable.
You are requested to indicate acceptance of this agreement by signing in the appropriate place on the attached copy of this letter and returning same to the undersigned. * * *
*517 (b) Acceptance of the agreement was noted by plaintiff’s president on January 22, 1949.
21. On January 27,1949, plaintiff’s vice president inspected the cracking cases at the Sun Shipbuilding plant. On the next day the vice president wrote to plaintiff’s agent of a visit he had made to the offices of the Houdry Corporation, saying, in part:
Naturally, our main hope as far as Houdry is concerned is working out some deal on the 18 cracking cases located at Sun Ship at Chester, Pa., which Bill and I inspected yesterday, and which, frankly, due to their size, et cetera, are not of any appreciable value for other uses than cracking cases, so should it be deemed even slightly possible that something could be worked out, it would undoubtedly be worth our investing a few additional dollars in storage for these cracking cases pending the outcome of possible negotiations.
The 18 cracking cases originally cost the Government over one million dollars, and Simmons’[24] opinion was that as cracking cases they would be a very good buy for one of their customers at 50‡ on the dollar. You can certainly see what result such sale might have on the ultimate success of the deal. * * *
Incidentally, we also found out that the cracking cases can “wear out” and it might also be possible for you to get a release that we could sell the cracking cases as replacements where they would not constitute new unit installations. * * *
22. On February 2, 1949, a representative of plaintiff, in New York, telephoned the vice president of Sun Shipbuilding & Dry Dock Company, and confirmed the call with the following letter:
Confirming our telephone conversation, you are to have both halves of one (1) Cracking Case removed and bill us through this office for charges.
Unless we hear further from you, we will come to Chester next Monday to inspect the Cracking Case.
23. (a) Delays were encountered in completing arrangements for the joint inventory of the property. It was be *518 gun on or about February 14, 1949, and completed one month later.[25]
(b) On March 8, 1949, representatives of plaintiff and of WAA inspected the cracking case from which the ends had been removed.[26] There were no “tube elements” in the case. The representatives of the parties had previously satisfied themselves that if one cracking case contained no tube elements, the same would be true of all of the cases.[27]
(c) The only tube elements found by the joint inventory were those that were separately listed in the brochure under “Item” as TUBES of one kind or another.[28] There were no tube elements with the cracking cases in the sense of being unlisted accessories of the cases.[29]
(d) Other deficiencies, all in the nature of shortages, were disclosed by the joint inventory. Four instances reflected shortages of “items” listed in the brochure in capital letters. Two other instances reflected shortages of units in the items (in the sense of the absence of tube elements being shortages of units of the cracking case item). These *519 deficiencies are hereinafter noted specifically and in detail.
24. (a) On March 10, 1949, plaintiff (by its Washington agent) wrote to WAA as follows:
Supplementing our conversation of today, request is hereby made on behalf of Dulien Steel Products, Inc. of Washington that the time for the commencement of payments be extended for a period of thirty days from the date when the initial payment is due under the terms of the existing contract (either March 14, 1949, or March 19, 1949, I am not certain which) and that the time for the payment of succeeding installments due after the first installment be similarly extended by an additional thirty days for each such payment.
I explained the reason for the extension request to you orally. Summarized, it is as follows: Due to the delays encountered by War Assets Administration in obtaining clearance from the Department of Justice, which in turn delayed War Assets Administration’s necessary preparation for the predelivery inventory contemplated by the contract, War Assets Administration was unable to commence its joint inventory with my client until February 14, 1949. In view of this unavoidable delay, War Assets Administration extended the time contemplated by the contract for, delivery from February 28, 1949, to March 20, 1949. Eepresentatives of my client are presently engaged with representatives of War Assets Administration in making the required predelivery inventory. This is not proceeding as rapidly as contemplated when the time for delivery was extended twenty days by reason of the difficulty which War Assets Administration is encountering in gaining access in some of the storage points to the material included in the purchase.
By reason of all of the foregoing, my client has been delayed in obtaining possession of its merchandise, with a naturally resultant retardation of its sales program. Under the circumstances, I believe its request for the thirty day extension is justified.
In responding to this letter, will you also please advise me the precise date shown by your records for the commencement of payments?
(b) On March 18,1949, WAA replied:
Eeference is made to the credit agreement dated January 19,1949, * * *.
*520 It was provided in that agreement that you were to make a down-payment of 15% on the purchase price of $352,115, and that the remaining balance was to be paid by you in five equal installments falling due 60, 90,120, 150 and 180 days from the date of final award. The date of final award has been determined as January 14, 1949, and consequently the first installment is now due.
In your behalf, Mr. Irwin Geiger has requested, in a letter dated March 10, that the time for the commencement of payments be extended * * *.
* ❖ * * *
Assent to your proposal, through Mr. Geiger, entailing a total credit period exceeding 180 days, would mean a rather heavy outlay in interest payments. As an alternative solution to the problem, offering measurable relief, we are willing to amend the original agreement, so as to provide for four instead of five installment payments, to be made as follows:
90 days from date of final award-$59, 971. 75
120 days from date of final award_ 59, 971. 75
150 days from date of final award_ 59, 971.75
180 days from date of final award_ 119, 943. 50
You are requested to indicate acceptance of this revised schedule of payments by signing in the appropriate place on the attached copy of this letter and returning same to the undersigned.
. (c) Plaintiff’s acceptance was noted by its president on March 25, 1949.
25. (a) On March 14,1949, plaintiff’s vice president wrote to WAA:
* * * the eighteen (18) cracking cases * * * were inspected jointly on * * * March 8th * * *. [They] were found to be complete and satisfactory as described * * * with the exception that the tube elements are missing. We are in the course of preparing our claim for this shortage * * *.
(b) On March 22, 1949, plaintiff’s vice president again wrote to WAA:
* * * We have made careful investigation and have ascertained that the following tubes constitute the tube elements for each of the eighteen (18) cracking cases.
*521 Gov’t Acs. Quantity . Type , Each *** 5 g
295 RT Tubes_ $45. 424 © ^5 rtf H €£•
252 KT Tubes_ 54. 10 <N CO c© H
312 DT Tubes_ 81. 10 CO CO d
564 Insert Tubes (see following items)
564 Insert Tubes, Tops_ 4. 825 © (M
564 Insert Tubes, Bottoms_ 4. 397 tH <N
Total, Tubes Per Case_ 57, 537. 69
18 Cases at___ 57, 537. 69
Total_ 1, 035, 678. 42
On the basis of your letter of December 30th, the adjustment to be allowed covering shortages of tubes, as per paragraph (4) (a)? is 18% of the acquisition cost.
We, therefore, herewith enter our claim for shortage as set forth above in the amount of $186,422.12.
(c) Plaintiff ascertained the constituent units of the tube elements intended for installation in the cracking cases by examining the drawings, which it obtained for the purpose.[30] Many, if not all, of the acquisition costs of the constituent units were obtained by plaintiff from the listing of similar (if not identical) units in the brochure.
26. (a) On March 22,1949, plaintiff’s vice president wrote to WAA:
* * * we wish, to call your attention to the following shortages existing as determined after pre-delivery inventory just completed.
W: A. A. Serial No. 3273662-03-01 (TPLL 2771) 2-6 ton capacity Vale & Towne Chain Hoists, price $1,307.00. Total $2,614.00
W. A. A. Serial No. 3273586-01-01 (TPLL 2520) 1 Depropanizer Peed Surge Tank. Cost $2,330.00.
In view of the circumstances as set out below, we do not feel that adjustments on the shortage of these two (■2) items should be as per the formula set forth in your letter of December 30th. Instead, based on these circumstances, we believe that credit in the full amount of both items should be.allowed and we, therefore, herewith request total credit on these items in the amount of $4,944.00.
*522 W. A. A. Serial No. 3273662-03-01 (TPLL 2771) This unit was taken by Janmat, their tag No. 2 K 523 — transfer No. 103318, dated February 18th, 1949.
On the inside of the front cover of the brochure the following appears:
“ (All the equipment in this listing requiring screening by JANMAT has been so screened.)”
This item was generally commercially salable and did not constitute an actual shortage as the property was at the stipulated location when the material was sold to our company.
W. A. A. Serial No. 3273586-01-01 (TPLL 2520) This item was sold to an oil company on New York Sales Document #6523264 and shipped to the oil company on February 12th, 1949 which, of course, is a date considerably after the date on which the item was sold to our company. This item was also a generally commercially salable item.
(b) Following is the brochure’s description of plaintiff’s reference to WAA Serial No. 3273662-03-01 (Yale & Towne Chain Hoists):[31]
HOIST, 6 ton, Shaw Box Type #H-SUH Hand 2 Oper. Single Girder, Underhung, Bridge Ea. Crane (2 bridges to one unit) Mfr. Yale & Towne, Pkg 4 Pcs. and 4 box #1 to 8. Prop. Loc. #4, Acq: $2,614.00 (Ref: WAA #3273662-3-1, TPLL 2771, Whse Loc. E 43)
These two hoists were transferred to JANMAT[32] by WAA after the sale to plaintiff.
(c) Following is the brochure’s description of plaintiff’s reference to WAA Serial No. 3273586-01-01 (depropanizer tank):[33]
TANK, Depropanizer, feed surge, 8' OD x 14' L 1 for Houdry Gas plant, Mfr. Heilman Boiler Ea. Wks., Gr. Wt. 20601 lbs. Prop Loc #4. Acq. $2,330.00 (Ref : WAA 3273586, PI LI, TPLL-2520, Loe TR-24-EF)
This tank was sold by WAA after the sale to plaintiff.
27. (a) On March 30,1949, plaintiff’s vice president wrote *523 to WAA concerning the property located at Horseheads, New York:
Joint inventory * * * was completed on March. 17th and 18th, * * *. .
* * * the following shortages were discovered:

Our Item Number Qovt. Ac-Quantity Equipment quisition

678 (WAA 3273795-20-1, TPLL2633) 1 pump $889.00
679 (WAA 3273795-21-1, TPLL2633) 1 pump 890.00
681 (WAA 3273795-23-1, TPLL2633) 1 pump 1053.00
682 (WAA 3273795-24-1, TPLL2633) 1 pump 503.00
683 (WAA 3273795-25-1, TPLL2633) 2 pumps 1098.00
684 (WAA 3273795-26-1, TPLL2633) 1 pump 816.00
686 (WAA 3273795-28-1, TPLL2633) 1 pump 919.00
The total of the above is $6,168.00, and we, therefore, herewith enter our claim for $1,110.24.
With regard to our item #342 (WAA 3272150-12-1, TPLL 2490) which is listed in the brochure as 493,591 lbs. of spare parts for compressor and motors, please be advised that the quantity available is 4,979 lbs., or only 10.1% of the quantity purchased. The total government acquisition of this particular item is $59,985.60— 10.1% of which is $6,058.55, or a shortage on government acquisition of $53,927.05, on which we herewith enter our claim in the amount of $2,588.50.
With regard to our items 337-338-340 (WAA 3272141-1-1, TPLL 2461 — WAA 3272141-6-2, TPLL 2461 — WAA 3272150-1-1 TPLL 2490) we would call your attention to the fact that these three items cover 166 motor operated valves of which only 145 are available. This registers a shortage of 21, the acquisition cost of which is $1,920.58 or a total acquisition of $40,-332.18, against which we herewith enter our claim for $7,259.79.
With regard to our items 333 and 334 (WAA 3272138-1-1, TPLL 2459 — WAA 3272138-3-1, ■ TPLL 2459) you will note that the brochure indicates many various items such as tubes, burners, structural steel framing, etc. All is available are 16 cases of castings all of these items being short and missing. The total acquisition of these two items is $57,489, and instead of usable material all that we have had delivered to us are the 16 boxes of castings. This materially affects the *524 recovery value which we would otherwise have experienced. Due to the peculiar circumstances, we feel that the claim should be an amount to be mutually agreed upon.
(b) On April 4, 1949, plaintiff’s vice president again wrote to WAA:
Following up our letter of March 30th, we wish to call your attention to an error in the letter in the second paragraph on page 2.
This correction is with regard to our item # 342.
The paragraph should read,
“With regard to our item #342 (WAA 3272150-12-1, TPLL 2490) which is listed in the brochure as 493,591 lbs. of spare parts for compressor and motors, please be advised that the quantity available is 4,979 lbs., or only 1.01% of the quantity purchased. The total government acquisition of this particular item is $59,985.60— 1.01% of which is $605.85, or a shortage on government acquisition of $59,379.75, on which we herewith enter our claim in the amount of $2,850.23.” * * *
(c) The pumps listed by plaintiff were described in the brochure.[34] Following is the text of the first of such items, which is illustrative of all:
PUMP: Reciprocating, Badger Spec SP2434PL-7 Bottoms Product, Cracking, 2 boxes 8/16 & 9/16 Prop Loc. #6 Acq. $1,7/8.00 (Ref. WAA 8273795 P20 LI, TPLL-2633, Loe N. A.)
Eight of the pumps were missing. Their total acquisition cost was $6,168.00.
(d) Following is the brochure listing of the item described by plaintiff as “our item #342 (WAA 3272150-12-1, TPLL 2490)”:[35]
COMPRESSORS & Motors, Spare parts for, as 1 follows: 1 set spare parts for 40,000 CFM Type JL VA-820 Axial compressor, Equip. #44P3-1, cost $35,933.70. Same as above for 23,000 CFM YA 721 axial comp, equip. #44P3-2, $23,996.90, Same as above for Motors for compressors, Cost *525 $55.00. Equip, as per Historical record. Total Gr. Wt. 493,591 lbs. Prop. Loc. 6, Acq. $59,-985.60. (Eef: WAA #3272150-12-01, TPLL #2490, Whse. Loc. H-21-6)
The property received by plaintiff pursuant to this item weighed 4,979 pounds.
(e) Plaintiff’s “items 337-338-340 (WAA 3272141-1-1 * * * [and] * * * 3272141-6-2 * * * a n d 3272150-1-1 * * * )” were listed in the brochure as follows:[36]
VALVE, Flanged Gate, Mfr. Wm. Powell Co., 87 for motor operation to suit a motor operat- Valves ing unit type OS, as Mfr. by Phila. Gear 1-Lt Wks., Badger, & Sons Spec. #SP-243C3-1, sheets 1 to 13 inc. Eev. 11, 9-1-44 valves range in size from 3" to 18". Some with aux. pipeing [sic] some with magnetic brake some without, as described in historical record. Unit costs range from $1,014.65 to $2,785.40. Prop. Loc. 6, Acq. $165,598.50 (EEF: WAA #3272141-1-1, TPLL #2461, Whse. Loc. N. A.)
VALVE, Flanged gate, Mfr. Wm. Powell 13 Co., for motor operation to suit a motor Valves operating unit type OS, as Mfr. By Phila. 1-Lt. Gear Wks., Badger & Sons Spec. #SP 2444C3-1, Eev. 1, 9-1-44, valves range in size from 12" to 18", unit cost range from $2,105.75 to $2,705.30. Prop. Loc. 6, Acq. $30,650.20. (EEF: WAA #3272141-6-2, TPLL #2461, Whse. Loc. H-13-5)
VALVES, Gate, motor operated, Mfr. Powell 66 size range 4" to 16", unit cost range, Valves $1,146.20 to $2,570.15. Some with aux. 1-Lt. steam, some without, as described in Historical record.
Nineteen valves were missing from these items. Their acquisition cost was $36,949.00.
(f) Plaintiff’s “items 333 and 334 (WAA 3272138-1-1, * * * [and] * * * 3272138-3-1)” were listed in the brochure as follows:[37]
*526 COMPONENT PARTS for Houdry Cracking 1 and treating beater units, consisting of castings, Lt. steel sheeting, tubes, headers supports, burners, roof, framing, doors, dampers, thermocouples, wells, platforms, ladders, structural steel etc., above for 6 case & S case units, Above as listed in Historical Record, packed in 16 cases, Gr. Wt. approx. 55,000 lbs. Prop. Loc. 6, Acq. $28,- • 144.50. (REF:WAA #8272138-1-1, TPLL #2459, Whse. Loc. Area 8, Ramp, Tr. 41)
COMPONENT PARTS for Houdry Cracking 1 and treating heater units, consisting of casting, Lt. steel sheeting, tubes, headers supports, burners, roof, framing, doors, dampers, thermocouples, wells, platforms, ladders, structural steel etc., above for 6 case and 3 case units, Above as listed in Historical Record, packed in 16 cases, Gr. Wt. approx. 55,000 lbs. Prop. Loc. 6, Acq. $28,-154.50. (REF:WAA #3272138-3-1, TPLL #2459, Whse. Loc. Area 8, Ramp Tr. 41.)
The inventory report made by the WAA representative listed no shortages in these items.
28. (a) On June 14,1949, plaintiff’s vice president wrote to WAA:
We are cognizant of the payment due tomorrow on our purchase * * *.
We wish to call your attention, however, to the fact that requests for adjustment in the contract have been entered based on shortages in our purchase in an amount exceeding the balance due on our purchase contract and we, therefore, believe it unnecessary for us to make additional payments on this purchase.
(b) On June 16, 1949, WAA replied:
Reference is made to a letter dated June 14, 1949 delivered by hand to this office from your * * * Vice President, stating that you believe it unnecessary to make additional payments on above stated purchase in view of the interpolation of a claim.
We cannot agree to this presumption as the mere fact that a claim has been filed should in no way mitigate against the payment schedule agreed upon in credit agreement. When your claim has finally been adjudicated an adjustment will be made by either credit memorandum or refund.
An installment payment of $59,971.75 was payable June 14, 1949 and by virtue of non-payment now places *527 ns in a position where we may invoke the acceleration clause written into the agreement.
Unless a check is received by ns for the amount of June 14, 1949 installment as aforementioned on or before June 27, 1949 we will have no other alternative than to refer the matter to Legal Counsel for appropriate action in order to protect the Government’s interest.
(c) On June 21, 1949, plaintiff’s attorney (the Washington agent) wrote to WAA:
Your letter dated June 16th * * * has been referred to me for reply.
As I understand the situation, there is nothing due War Assets Administration on this deal and, in fact, the purchaser is entitled to a credit balance.
Under the terms of a letter dated December 30, 1948, setting forth the conditions of the sale, a pre-delivery inventory was required. The letter provides that “If shortages or overages are found to exist in the items of property described in the sales brochure, an adjustment shall be made in the purchase price as follows: . . Then follows a schedule of percentages of acquisition cost to be applied to various agreed categories of material. Pursuant to the agreed terms and conditions, a pre-delivery inventory was in fact taken by representatives of War Assets Administration and my client. All shortages and overages were noted by the respective representatives at the time of the taking of this joint inventory and promptly reported. The dollar volume of the total items short computed in conformity with the prescribed formula together with the amounts previously paid in cash by Dulien Steel Products, Inc. exceed the original cash price and as a consequence justifies my statement that Dulien Steel Products, Inc. is not indebted to War Assets Administration in any amount on this transaction. I, of course, have no information as to your internal procedure whereby the adjustment prescribed by the contract was referred by your office, as I understand it has been, to the Claims Division in Washington.
We have made no claim in the sense that term is usually made. All that was done was to jointly report the actual shortage as the basis for the prescribed adjustment. I am uninformed that any one of the items comprising these agreed shortages is in dispute and my client tells me that no such contention has ever been made by anyone connected with War Assets Administra-tration. The only thing that remained to be done after *528 these shortages were reported was the dollar value computation in conformity with the prescribed formula. If the figures submitted by my client in connection with that calculation are at variance with those of your office, please advise me and I am sure these differences can be reconciled.
29. (a) On February 16,1950, the Assistant General Counsel of General Services Administration (successor to WAA, and hereinafter referred to as GSA) [38] wrote to plaintiff:
* * * investigation of this case has been completed. * * * the decision of our Regional Office allowing this claim in part in the amount of $7,933.41 has been sustained.
In the absence of additional evidence proving the facts to be other than as shown by the record, the enclosed decision represents the final position of this office in the matter.
Upon execution and return to this office of two of the enclosed release forms, your account will be credited accordingly.[39]
(b) The “decision on claim”, which was attached to the foregoing letter, contained (1) facts; (2) conclusion; and (3) recommendation.
(c) The review of the facts, tantamount to findings by the reviewing agency, covered claims for the following: (1) the depropanizer tank;[40] (2) two hoists;[41] (3) eight pumps;[42] (4) spare parts;[43] (5) 21 valves;[44] (6) component parts;[45] (7) tubes missing from cracking cases;[46] and (8) structural steel.[47]
(d) The conclusion was predicated on the assertion that “the agreement between the parties is binding on the question of shortages.” Determinations were then made as fol *529 lows: (1) That there was a shortage of the depropanizer tank and the two hoists, for which plaintiff should be allowed a credit of 4.8 percent of the acquisition cost;[48] (2) that there was a shortage of eight pumps, for which plaintiff should be allowed a credit of 18 percent of the acquisition cost;[49] (3) that, as to the spare parts (of which plaintiff received 4,979 pounds as compared with the brochure listing of 493,591 pounds), the error was so patent (in terms of pounds listed and acquisition cost given, indicating the purchase of nearly half a million pounds at a cost of 12 cents per pound) as to put plaintiff on notice, wherefore no allowance should be made; (4) that 19 valves were missing, for which plaintiff should be allowed a credit of 18 percent of the acquisition cost;[50] (5) that the description in the brochure listing tube elements with the cracking cases was in error,[51] which error was so patent (in terms of the acquisition costs given for the 18 cracking cases and for tube elements elsewhere in the brochure) as to put plaintiff on notice, wherefore no allowance should be made;[52] and (6) that there was a shortage of structural steel, as to which the agency would accept, as an accord and satisfaction, plaintiff’s offer to settle for a credit of 4.8 percent of an acquisition cost of $364.11.[53] No conclusion was stated as to the component parts, as to which WAA found no shortage reported by its inventory representative.
(e) The recommendation proposed, “as a legal adjustment,” credits (1) for the tank and hoists, $237.31; (2) for the eight pumps, $1,110.24; (3) for the 19 valves, $6,568.38; and (4) for the structural steel, $17.48. The total of the credits recommended was $7,933.41. The recommendation proposed “denial of the unevaluated portion of the claim and of the balance of claim in the sum of $194,670.45.”
*530 30. (a) On May 3,1951, a Certificate of Settlement was issued in this matter by the General Accounting Office.[54] The petition in this case was filed one month later, on June 13,1951. On August 10,1954, the General Accounting Office forwarded to plaintiff a Certificate of Indebtedness wherein the Acting Comptroller General asserted claim against plaintiff for “* * * the sum of $205,820.51, plus interest at 4% per annum on the principal balance of $171,517.09, from June 13,1954 until paid * *
(b) Of the $352,775.00 bid by plaintiff, and representing the purchase price under the contract of sale, plaintiff has paid the sum of $173,084.75. The difference between the two figures is $179,690.25, which represents the unpaid balance of the agreed purchase price at the time plaintiff presented its claims to WAA.
(c) Plaintiff seeks by this action to recover from defendant the sum of $48,426.16, which represents the difference between $228,116.41 (plaintiff’s total claim against defendant) and $179,690.25 (which plaintiff admits defendant is entitled to recover on its counterclaim, as the unpaid balance of the purchase price). The total claim of plaintiff ($228,116.41) consists of claim for $4,944.00, as the fair and reasonable value of the tank and hoists,[55] and of claim for $223,172.41 representing shortages composed of the following: (1) tube elements missing from the cracking cases, $212,386.33;[56] (2) 19 valves, $6,650.80; (3) spare parts, $2,850.23; (4) eight pumps, $1,110.24; and (5) structural steel, $174.81.
.(d) Defendant demands recovery on its counterclaim of $171,517.09 (representing the unpaid balance of the purchase price, $179,690.25, minus the credit established by the General Accounting Office’s Certificate of Indebtedness in the *531 sum of $8,173.16 [57]), plus interest at 4 percent per. annum from June 13,1949, to the date of payment.[58]
31. (a) For the shortage of eight pumps defendant acknowledges credit to plaintiff in conformity with the adjustment formula (18 percent of the acquisition cost) in the sum of $1,110.24.
(b) Similarly, for the shortage of 19 valves, defendant acknowledges credit to plaintiff in conformity with the adjustment formula (18 percent of the acquisition cost) in the sum of $6,650.80.
(c) For a shortage of structural steel, defendant acknowledges a credit to plaintiff of $174.81.[59]
(d) The three credits listed in this finding total $7,935.85. None is in dispute.
32. (a) The two hoists (transferred by WAA to JANMAT after the sale to plaintiff) [60] and the depropanizer tank (sold by WAA after the sale to plaintiff)[61] represented a combined acquisition cost of $4,944. This figure represented the fair and reasonable market value of the three pieces in March 1949.
(b) Defendant acknowledges credit to plaintiff for the shortage in conformity with the adjustment formula (4.8 percent of the acquisition cost) in the sum of $237.31.[62] Unless plaintiff is entitled as a matter of law to recover the market value of these items, as for breach of contract, the amount of its recovery on the tank and hoist claims should be $237.31.
*532 (c) If, as plaintiff contends, it is entitled as a matter of law to recover the market value of the tank and hoists, as for breach of contract by defendant, the amount of its recovery should be $4,944- on these two claims.[63]
33. (a) The spare parts of compressors and motors, for which plaintiff received 4,979 pounds, were described in the brochure[64] as “1 JL [Job Lot] COMPRESSORS & Motors, Spare parts for * * *” et cetera. Three sets were listed, with an acquisition cost for each set, the total acquisition cost being given as $59,985.60, followed by “Total Gr. [Gross] Wt. [Weight] 493,591 pounds.”
(b) Plaintiff’s computation of its claim (applying the adjustment formula of 4.8 percent to 98.99 percent of the acquisition cost) [65] is mathematically correct[66] and represents a reasonable method of applying the adjustment formula, if plaintiff is entitled as a matter of law to recover for the shortage.[67]
34. It is not established by the evidence that there was a shortage of component parts, for which plaintiff made claim in its letter of March 30,1949.[68]
35. (a) The tube elements were not in the cracking cases; neither were they with the cases, in the sense of being stored nearby as components of the cracking cases without listing in the brochure (other than “cracking case, w/tube elements” et cetera).[69]
(b) Plaintiff’s bid was prepared on the assumption that the tube elements were in the cracking cases.[70] This was in mid-October 1948. The contract between plaintiff and *533 WAA was formalized on December 30, 1948,[71] and became final and binding on January 12, 1949.[72] The absence of the tube elements from the cracking cases was confirmed by the joint inventory on March 8, 1949.[73] Plaintiff’s claim was submitted on March 14, 1949, on the basis of “missing” tube elements.[74]
(c) It is not established by the evidence (1) that plaintiff’s assumption that the tube elements were m the cracking cases was a reasonable assumption or (2) that, if plaintiff had not so assumed, reliance by any bidder upon the letter, symbol, and words “w/tube elements * * *” et cetera, as indicating inclusion in the sale of unlisted tube elements for 18 cracking cases would have been reasonable.
(d) If, prior to December 30, 1948 (when the contract was formalized), or prior to January 12, 1949 (when the contract became final and binding), plaintiff did not know (1) that the tube elements were not in the cracking cases and (2) that the sales offering encompassed no such quantity of tube elements in addition to those listed as would have been required to match the full components of 18 cracking cases,[75] it reasonably should have known these facts.[76]
(e) It is not established by the evidence that such reliance as plaintiff may have placed upon the presence in the sale of the tube elements in controversy, either in the preparation and submission of its bid in October 1948 or at the time of the exchange of correspondence formalizing the contract in December 1948, was reasonable.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover the sum of $15,730.08, to be set off against the recovery by the defend *534 ant on its counterclaim; and that the defendant is entitled to recover on its counterclaim, after the offset of the plaintiff’s recovery, the principal sum of $163,960.17, plus interest on such principal sum at the rate of 4 percent per annum from the 13th day of June, 1949, to the date of judgment. It is therefore adjudged and ordered that the defendant recover of and from the plaintiff the sum of one hundred sixty-three thousand nine hundred sixty dollars and seventeen cents ($163,960.17), plus interest on said sum at the rate of four percent (4%) per annum from the 13th day of June, 1949, to the date of payment.

 Hereinafter referred to as WAA.

 Plaintiff contends that one Important condition was omitted in tlie restatement in the sales documents. See footnote 6.

 The WAA representative so testified.

 The transfer of the hoists to another Government agency Is on all fours with both cases.

 The testimony of the WAA representative is devoid of details relating to the inventory.

 Plaintiff's brief, in answering some of defendant’s arguments, makes the point that the special condition which eliminated from the general conditions the warranty of description was omitted from the sales documents, which purport to contain the contract in its entirety. If such an omission was made, there is no evidence of knowledge or overt intention by either party in relation to it at the time.

 Defendant’s auditors reexamined the drawings and acquisition costs,, and applied the adjustment formula in accordance with plaintiffs contention. The results they obtained reflected a larger claim, in dollars, than plaintiff had computed. At the trial plaintiff accepted and now relies on the auditors’ computation.

 Defendant’s brief further asserts (while plaintiff’s reply brief denies) that plaintiff’s proposed application of 18 percent of acquisition cost to an ITEM not listed as TUBES (or PIPE, PUMPS, or VALVES) is inconsistent with the intent and purpose of the adjustment agreement.

 In the absence of reasonable reliance on WAA’s description, the question of warranties is not reached.

There Is no affirmative evidence that any other officer or any employee of plaintiff had seen the brochure before the bid -was submitted.

 This figure is the sum of $6,650.80 (for 19 valves), $1,110.24 (for 8 pumps), $174.81 (for structural steel), $4,944.00 (for the depropanizer tank and 2 hoists), and $2,850.23 (for spare parts).

 Neither of the parties is chargeable -with neglect in the elapse of time required to bring this case to a conclusion.

 Details of tie order are in evidence that were not known to plaintiff until placed in evidence during the trial. These facts are summarized in this note for the light they shed on the origin of the dispute.
In September 1944, the Procurement Division of the Treasury Department, acting by and through E. B. Badger & Sons Company, placed orders for the manufacture of two refining plants, each plant to consist of nine cracking cases, and to be supplied with one set of extra tubes as well as tools and other spare parts.
Two identical contracts were simultaneously made with the Sun Shipbuilding & Dry Dock Company, each contract calling for the manufacture of nine cracking cases, together with tubes, flanges, and other parts of the internal mechanism, and for one extra set of the internal parts plus tools and other spare parts. Other components were ordered from other manufacturers.
The unit price of each cracking case was $125,039. This price included all internal parts. The completed units were to be packed separately, however. Each case was a huge cylindrical tank, approximately 12 feet in diameter and 28 feet long, with net weight (empty) of 153,940 pounds (roughly 77 tons). Since the property was to be shipped, these cases were to be skidded, and the tubes and other internal parts were to be boxed or crated. If the tubes and other parts had been installed in the cases, each case would have weighed approximately 460,000 pounds (230 tons).
The unit price for “one * * * complete set of spare tubes for one case, consisting of 859 elements * * *” was $67,885. By deduction ($125,039 —$67,885) the price of a cracking case, empty, was $57,154.
The unit price for “tools and miscellaneous spare parts * * * for nine * * * cases * * *■” was $9,154.
The total cost of the two orders placed with Sun Shipbuilding was $2,404,780.

 “What hind of surplus property Is available ? Practically everything that can be thought of. The Surplus Property Board estimated that some 4,000,000 different Items are on sale — enough to fill 50 mail order catalogs. They range from a screw driver or a pair of gloves to a completely integrated steel mill or a 35,000-ton luxury liner.” Surplus Property Disposal — Short Guide, Prentice-Hall, Inc., § 35,011, 12-4-45. In the adjacent text of this summary the value of the surplus property then for sale was estimated as being $500 million.

 The War Assets Administration was created on January 31, 1946, by the merger of the Surplus Property Administration and the War Assets Corporation. It began operations in March 1946. Its functions were transferred to General Services Administration on June 30,1949.

 The instant case represents the epitome of WAA’s efforts to avoid known pitfalls, for reasons appearing in subsequent findings.
In this note, as in footnote 1, facts brought to light after the contract was made between plaintiff and WAA are summarized for the light they shed on the nature of the controversy.
When the refining machinery described in footnote 1 was declared surplus, WAA, following its usual practice, assigned to staff members the task of transferring to WAA forms (known as WAA — 4’s) the data made available by the declaring agency, and supplemented the information with such data as were available in the warehouses and storage yards.
The brochure containing the sales offering was made up from these forms.
WAA knew, in the preparation of the brochure, that the offering was incomplete, in that it did not contain all of the parts of two complete refining plants. The evidence does not fully explain why all of the parts were not assembled in one offering. The fact is established, however, that WAA knew that it was offering two incomplete refining plants; and during the trial, the further facts developed that the offering accounted for approximately 80 percent of the parts for the two plants other than the cracking cases (all of the cases being in this offering), and that the parts missing from this offering had been listed by the declaring (defense) agency on a separate declaration from the one used to make up the warehouse forms on which the instant offering was based.

 This brochure is variously referred to hereinafter as the brochure, the sales offering, or the special listing. It is in evidence as plaintiff’s exhibit No. 10, and is incorporated herein by reference.

 For convenience of reference, the terms stated in this paragraph, and the locations named in the paragraph following it, are summarized:
1) Terms: “As Is, Where Is”, purchaser responsible for any necessary dismantling, removal, packing, crating, skidding, loading and shipping.
a) Location: No. 1, Sun Ship & Dry Dock Company, Chester, Pennsylvania.
2) Terms: “As Is, Warehouse Platform”, purchaser responsible for any necessary packing, crating, skidding, loading and shipping.
a) Locations: Nos. 2 (Yonkers Warehouse), 5 & 7 (General Builders Supply Company, Bronx).
3) Terms : “As Is”, f. o. b. location basis.
a) Locations : Nos. 3 (Marietta Depot), 4 (Belle Mead. General Depot), and 6 (Elmira Depot, Horseheads).

 Tliere was listed for each “Item” an acquisition cost which covered "Quantity” as well. For example, If the “Item” was “PUMP” and the “Quantity” “2”, the dollar figure represented the acquisition cost of two pumps.
WAA used the total acquisition cost as one of its guides in estimating the ratio of return (proportion of cost to be realized from sale) which might reasonably be anticipated. By the same token, the listing of acquisition costs was presumably intended to afford potential bidders some indication of the values to be ascribed by them to the various items.

 The quotient of this sum divided by 18 indicates a cost of $56,500 for each cracking case. Cf. footnote 1, where the cost was deduced as being $57,154.

 Cf. finding 5 (d) and footnote 8. The terms of sale for this location were “As Is, Where Is.”

 No. 390, as revised 2-5-48.

 This was the description given of “purchaser’s business.”

 Mr. Geiger is plaintiff’s attorney of record in this case.

 The bid was prepared in Seattle and submitted in New York.

 He had had wide experience in liquidating large installations.

 The high bid at the initial offering was not rejected at the time of submission. The Special Representative had returned to California (from New Tort) before he learned there had been no sale. He was still not interested in bidding on it.

 By long distance telephone from Los Angeles to Seattle on October 12, 1948, the commission-broker advised plaintiff’s president: “The cracking cases * * * are full of tubes, and the weight on them Is 3,750 tons.” (This computation would indicate a net weight per case of 416,666 pounds, as conk-pared with a net weight of 153,940 pounds stenciled on each case. Finding 9 (b>.)

 Sales involving property acquired at a cost in excess of $1,000,000 had to be referred to the Department of Justice for review and clearance under antitrust laws. The General Counsel’s office handled liaison with the Department of Justice.

 Cf. finding 5 (di), paragraph headed “Withdrawals,” which provided: “Property in this sals may be withdrawn np to the time of a sales contract with the buyer * * See also, in the same finding, paragraph headed “Who May Buy” : “(All the equipment in this listing requiring screening by JANMAT has been so screened.)”

 See findings 21, 22, and 23, and footnote 25, following finding 23 (a).

 Finding 17.

 It is not established by the evidence that the calls were made in the sequence stated. The Seattle call may have been first.

 Tils condition was inserted at the instance of the Department of Justice because of a suit then pending against the united States involving the patent rights of the Houdxy Corporation. There is no evidence of objection or question by plaintiff because of the insertion.

 Delivery of the sales document has been accepted by defendant’s attorney as fixing the date of consummation of the sale. Plaintiff contends the sale ■was completed on January 7, 1949. (Finding 18.) WAA established Jan-aary 14, 1949, in its records as the completion date. For the purpose of these findings, January 12 is regarded as the completion date, credit arrangements described in finding 29 to the contrary notwithstanding.

 Mr. Simmons was an officer of the Houdry Corporation.

 In preparation for the inventory, plaintiff’s vice president was supplied' by WAA with duplicates of the warehouse cards from which the sales offering was compiled. See footnote 4. These cards (or forms, known as WAA-4’s) were given to the representatives of plaintiff who conducted the inventory Jointly with WAA representatives holding similar cards. In making the inventory the representatives of the parties opened boxes and crates, counted units (parts of “items”), weighed some material, and generally performed a thorough inventory. It is to be inferred from the evidence that the methods used in conducting the inventory became known to responsible WAA officials while the work was in progress; that they sensed the procedure as exceeding the scope of what they had originally anticipated; but that no specific objection was registered by them.

 The work of removing the ends of the case was performed at plaintiff’s expense.

 Other facts developed during the trial established that there were no tube elements in the cases. See footnote 1.

 Tube elements listed in the brochure accounted for more than the extra sets (one for each of two refinery plants) ordered. At least some of the extras were among the tubes listed, since some were labeled spares in the brochure. All of the tubes listed in the brochure had an acquisition cost of $972,259 (finding 12 (d)), whereas the cost of one extra set (of 859 elements) was $67,885. Twenty sets (one for each of 18 cases plus two extras) would have cost $1,357,700. On this basis, some 71.6 percent of all the tubes ordered were in the listing.

 If all the tubes, for 18 cracking cases, had been with the cases (inside or outside) but not otherwise listed in the brochure, the sales offering would have accounted for tube elements having an acquisition cost of $2,194,189, representing more than 32 sets of tubes.

 The drawings were prepared by the Hondry Corporation and were furnished by it to Badger & Sons Company. The evidence is not conclusive as to the source from which plaintiff obtained them.

 In the brochure the listing appears on page 43, 1st column, 8th Item.

 JANMAT is not identified- in the evidence other than as a Governmental agency.

 In the brochure the listing appears on page 23, 2nd column, 2nd item.

 Page 28, column 2, items 12 and 13, and page 29, column 1, items 1, 2, 3, 4, and 6. These seven listings accounted for 12 pumps.

 This listing appears in the brochure on page 15, column 2, item 2. The acquisition cost, $59,985.60 reflects the sum of the other three dollar, figures In the listing.

 These listings appear in the brochure at page 15, column 1, items 5, 0, and S.

 These listings appear in the brochure at page 15, column 1, items 1 and 2.

 See footnote 3.

 Plaintiff never executed the release forms.

 Cf. finding 26.

 Cf. finding 26.

 Cf. finding 27.

 Cf. finding 27.

 Cf. finding 27.

 Cf. finding 27.

 Cf. finding 25.

 Plaintiff offered no evidence of its statement of or support for the claim for structural steel other than defendant’s acceptance of a compromise figure of $17.48 as the allowance to be made for it. The General Accounting Office subsequently gave plaintiff an allowance of $174.81 for the shortage. Cf. footnote 53 and finding 31 (c).

 The credit was computed at $237.31.

 The credit was computed at $1,110.24.

The credit was computed at $6,5.68.38. The General Accounting Office subsequently revised the computation to $6,650.80. Cf. finding 31 (b).

 The factual review asserted that the Inclusion of the tube elements in the declaration was In error; and that “* * * the tube elements for the 18 cracking cases In question were declared on other declarations, and were stored at other locations.” Cf. footnote 4.

 The conclusion on this claim was rested on the further ground that the adjustment formula related to “Items” in the brochure; that the “Item” in this instance was the cracking cases, and not the tube elements.

 The credit was computed at $17.48. Cf. footnote 47 and finding 31 (c).

 This certificate is not in evidence.

 Pldintiff seeks recovery for alleged breach of contract.' Defendant contends that if there was a legal wrong, it was a conversion and not a breach of contract. .

 Plaintiff’s initial figure was $186,422.12. (Finding 25 (b).) The amount alleged in the petition was $202,306.98. The present figure was computed by defendant’s auditors and accepted by plaintiff.

 The difference of §239.75 between this credit and the credit of $7,933.41 recommended by WAA (finding 29 (e)) resulted from the revision by GAO of the allowances for 19 valves (raised from $6,568.38 to $6,650.80, an increase of $64.42) and for structural steel (raised from $17.48 to $174.81, an increase of $157.33).

 Defendant’s computation of interest fixes the amount at $571.72 per month. As of June 13, 1957, 96 months had elapsed since June 13, 1949. The interest, on this basis, would, as of this writing, amount to more than $55,000, Increasing the total of the recovery sought by defendant to something more than $235,000.

 WAA established this credit on the basis of an accord and satisfaction in the amount of $17.48. The General Accounting Office recomputed the allowance as $174.81. The basis of the recomputation is not in evidence.

 Finding 26 (b).

 Finding 26 (c).

 Such a credit, added to those listed in finding 31, would fill out the full amount of $8,173.16 allowed by the General Accounting Office’s Certificate of Indebtedness. Finding 30 (a) and (d).

 Recovery on these claims in accordance with plaintiff’s contention would, when added to the total of credits listed in finding 31, represent a total of $12,879.85.

 For listing, see finding 27 (d).

Finding 27 (b).

The result of the computation is $2,850.23.

 If plaintiff is entitled to recover on this claim, the amount, added to the total shown in finding 31, would be $10,786.08 ; and the claims listed in finding 32 would increase the amount to $11,023.39 or to $15,730.08, depending upon the resolution of the tank and hoist claims.

 Finding 27 (a) and (f).

 If the tube elements had been with the cases as unlisted components, they would have represented acquisition costs, unlisted, of $1,221,930, Cf. footnotes 28 and 29. The adjustment formula was confined to acquisition costs shown in the brochure. This fact accounts for the adjustment figure of $212,386.33, computed by defendant and accepted by plaintiff, rather than 18 percent of the actual acquisition cost, which is $219,947.40.

 Finding 11 (c) and footnote 16.

 Finding 17.

 Footnote 23.

 Finding 23 (b).

 Finding 25 (a).

 Defendant bas requested an affirmative finding that plaintiff did learn these facts after its bid was submitted but prior to December 30, 1948. The evidence falls short of warranting such an affirmative finding.

 Cf. findings 11 (b), 15 (b), and 16.